NOSSAMAN LLP
STEPHEN P. WIMAN (SBN 54825)
swiman@nossaman.com
SCOTT N. YAMAGUCHI (SBN 157472)
syamaguchi@nossaman.com
777 S. Figueroa Street, 34th Floor
Los Angeles, California  90071
Telephone:  213.612.7800
Facsimile:  213.612.7801

Attorneys for the Federal Deposit Insurance
Corporation, as Receiver for IndyMac Bank,
F.S.B.

FILED
2011 JUL -6  PM 2: 41
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

FEDERAL DEPOSIT INSURANCE
CORPORATION, AS RECEIVER FOR
INDYMAC BANK, F.S.B.,

       Plaintiff,

       v.

MICHAEL PERRY,

       Defendant.

Case No.: CV11-5561 ODW (MRWx)

**COMPLAINT FOR NEGLIGENCE**

JURY TRIAL DEMANDED

402236

COMPLAINT FOR NEGLIGENCE

1

## **TABLE OF CONTENTS**

2                                                                                                    **Page**

3

4   JURISDICTION AND VENUE ..............................................................1

5   PRELIMINARY STATEMENT............................................................1

6   THE PARTIES ....................................................................................2

7   THE FACTS .......................................................................................3

8   I.      Background Of IndyMac Bank, F.S.B...............................................3

9   II.     IndyMac's Business Model..............................................................4

10  III.    Summary of Plaintiff's Claim...........................................................6

11  IV.     IndyMac's Loans Possessed Layers of Substantial Risk............................7

12  V.      In 2006 and 2007, Defendant Perry Possessed Knowledge Of

13          An Existing, Volatile And Uncertain Secondary Market..........................11

14  VI.     Defendant Perry Negligently Continued To Generate Risky

15          Loans For Sale With Knowledge That The Secondary Market

16          Was Uncertain And Volatile..........................................................31

17  VII.    Perry Admitted To Errors...............................................................32

18  CLAIM FOR RELIEF.......................................................................40

19  PRAYER ..........................................................................................40

20  JURY DEMAND ...............................................................................41

21

22

23

24

25

26

27

28

COMPLAINT FOR NEGLIGENCE

Plaintiff Federal Deposit Insurance Corporation, as Receiver for IndyMac Bank, F.S.B. ("FDIC-R" or "plaintiff"), alleges as follows:

## JURISDICTION AND VENUE

1.  This is an action arising under the laws of the United States of America, specifically including 12 U.S.C. § 1821(d)(2), (k) and (l) and 12 U.S.C. § 1819(a) and (b)(2)(A).  This court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345 and 12 U.S.C. § 1819(b)(2)(A).

2.  The United States District Court for the Central District of California ("Central District") is the proper venue for this action pursuant to 28 U.S.C. § 1391(b). The claims asserted herein arose within the Central District.

## PRELIMINARY STATEMENT

3.  Between at least April and October 2007, defendant Michael Perry ("Perry"), chief executive officer ("CEO") of IndyMac Bank, F.S.B. ("Bank" or "IndyMac"), negligently permitted, and presided over, and failed to suspend, limit or stop, the production of a pool of more than $10 billion in risky, residential loans intended for sale into a secondary market that at the time was admitted by Perry to be increasingly unstable, unpredictable, and illiquid due to increasing concerns about the credit quality of loans (including IndyMac's loans).  Perversely, instead of enforcing credit standards, Perry chose to roll the dice in an aggressive gamble to increase market share while sacrificing credit standards, even though a reasonable banker of a depository institution would have suspended, limited, or stopped the production of these risky loans during this time of known, unprecedented, and escalating risks.  Unable to sell these loans as intended into an illiquid secondary market, Perry lost his gamble and IndyMac was forced by the fourth quarter of 2007 to transfer the loans into IndyMac's investment portfolio where the loans ultimately generated substantial Bank losses in excess of $600 million.  At the time of this transfer in the fourth quarter of 2007, IndyMac itself projected that lifetime losses for these loans would exceed at least $600 million.

402236

1

COMPLAINT FOR NEGLIGENCE

4.    A large portion of this loss involved high-risk "piggyback loans" (combined first and second mortgages reflecting 90% to 100% of the value of the property purchased).  With regard to such loans involving an 80% first mortgage and a piggyback 20% second mortgage (i.e., no down payment), Perry admitted in a September 6, 2007 e-mail:  "we were idiots, absolute idiots to allow ourselves to do 80/20 piggybacks at the tail end of a long run in housing . . . ."

5.    In January 2008, after the transfer of the $10 billion pool of loans in the fourth quarter of 2007, Perry admitted: "Clearly, our risk officers are not to blame for the situation IMB finds itself in . . . .  This time the losses are 100% operating management's fault (from me on down) . . . there is no substitute for experience, good common sense and business judgment, and timeless credit underwriting principles . . . ."  Later in April 2008, Perry acknowledged responsibility for the Bank's debacle: "look, we've had lousy performance, and the buck stops with the CEO. . . . I'm a big believer in being held to account."

## THE PARTIES

6.    Pursuant to 12 U.S.C. § 1821(d)(2), the Federal Deposit Insurance Corporation, as receiver for IndyMac Bank, F.S.B., ("FDIC-R" or "plaintiff") is the successor to all claims originally held by IndyMac, and of any stockholder, member, accountholder, depositor, officer, or director of such institution with respect to the institution and the assets of the institution.  FDIC-R brings this action solely in its capacity as such receiver.  Plaintiff FDIC-R is authorized to sue pursuant to 12 U.S.C. § 1821(d)(2)(k) and (l) and 12 U.S.C. § 1819(a) and (b)(2)(A).  In accordance with 12 U.S.C. § 1821(d)(2), FDIC-R is a real party in interest to this action and is entitled to recover those damages alleged in this complaint.

7.    At all times relevant hereto, defendant Perry was, and is, a resident of the State of California and of the Central District.  Perry was CEO and a director (chair of the board) of IndyMac.  Perry assumed responsibility for the day-to-day operations of IndyMac's predecessor in 1993 and continued holding that responsibility within IndyMac

402236

2

COMPLAINT FOR NEGLIGENCE

as its organizational structure changed until July 11, 2008, when the Bank was closed. As CEO, Perry was the primary decision-maker at the Bank. Plaintiff sues Perry herein solely in his capacity as an officer of IndyMac.

8.      Perry's responsibilities included, without limitation, being aware of developments and activity within the mortgage and housing industries and how such developments and activity might impact IndyMac's business. Perry was responsible for working with other officers of the Bank to develop a strategic plan for the Bank and execute upon that strategic plan. On a day-to-day basis, Perry was responsible for oversight of both the profit centers and the managers who led those profit centers, as well as the Bank's risk management and administrative functions. In his position as CEO of the Bank, Perry possessed the power to control, modify, suspend or cease the production of loans.

## THE FACTS

### I.

### Background Of IndyMac Bank, F.S.B.

9.      Non-party IndyMac Bancorp, Inc. ("Bancorp"), presently in bankruptcy, was the publicly traded holding company for IndyMac. The precursor to Bancorp and IndyMac was IndyMac Mortgage Holding, Inc. (ultimately assuming the name IndyMac Bancorp, Inc.), founded as a passive mortgage real estate investment trust ("REIT"). In 1993, Bancorp transitioned its business model to become an active, operating mortgage lender. Bancorp terminated its REIT status effective January 1, 2000. On July 1, 2000, Bancorp acquired SGV Bancorp, Inc., which was then the parent of First Federal Savings and Loan Association of San Gabriel Valley, a federal savings association. Bancorp then contributed all of its assets and operations to this bank and renamed the bank IndyMac Bank, F.S.B. Bancorp wholly owned IndyMac Intermediate Holdings, Inc., which in turn was a shell holding company that wholly owned IndyMac.

10.     On or about July 1, 2000, IndyMac commenced operations with $5.1 billion in total assets.   The Bank originated residential loans for sale, securitization and investment.   Residential mortgage lending and mortgage bank activity were its primary businesses.

11.     The Bank ultimately was ranked as the seventh largest savings and loan association, second largest independent mortgage lender and eighth largest mortgage servicer in the United States as of December 2007.   From June 2005 to March 2008, IndyMac reportedly grew from approximately $18.3 billion to $33.7 billion in assets.

12.     Between 2000 and 2006, annual loan production increased from approximately $10 billion to almost $92 billion, of which $79 billion were sold in the secondary market.   Production decreased to approximately $78 billion in 2007 and $10 billion through March 31, 2008.

13.     Both the Office of Thrift Supervision ("OTS") and the Federal Deposit Insurance Corporation ("FDIC"), in a back-up capacity, regulated IndyMac.   On July 11, 2008, the OTS closed IndyMac.   On July 11, 2008, the OTS appointed the FDIC as receiver of the Bank.   Bancorp filed a Chapter 7 bankruptcy petition on July 31, 2008 (*In re IndyMac Bancorp, Inc.*, United States Bankruptcy Court, Central District of California, Los Angeles Division, Case No. 2:08-bk-21752-BB).

## II.

## IndyMac's Business Model

14.     IndyMac referred to its structure as a hybrid thrift/mortgage banking business model, comprised of mortgage banking and thrift segments.   As a thrift, IndyMac invested in single-family residential mortgage assets, primarily whole loans (individual loans that are not packaged as part of a securities offering) and mortgage backed securities, which were Held for Investment ("HFI").   Revenues from the thrift operation consisted primarily of spread income, representing the difference between the interest earned on the loans and the Bank's cost of funds.

15.     As a mortgage bank, IndyMac (a) generated residential loans for sale into a secondary loan market and (b) serviced residential loans.   Revenues from mortgage banking consisted primarily of gains on the sale of loans, interest income earned while loans were Held for Sale ("HFS"), and servicing fee income.   IndyMac generated loans for sale into the secondary market, including the subject $10 billion pool of loans, via the following channels:

(a)     Consumer Direct Division:  This division marketed mortgage products directly to existing and new consumers nationwide through direct mail, Internet, lead aggregators, outbound telesales, online advertising, and referral programs, as well as through IndyMac's retail bank branches.

(b)     Mortgage Professionals Group:  This division historically was the Bank's largest production division and was responsible for 86% and 62% of total production during 2006 and 2007, respectively.   This group originated or purchased mortgage loans through relationships with mortgage brokers, mortgage bankers, and financial institutions.  The Mortgage Professionals Group consisted of the following:

(i)     Wholesale - The wholesale operation involved mortgage brokers generating loans which IndyMac would underwrite and fund.  The Bank would then sell the loans into the secondary market, either as whole loans or as part of a securitized package of loans.

(ii)     Correspondent - The correspondent operation involved entities (correspondents) such as mortgage banks and other financial institutions.   The correspondent would process, underwrite and fund a loan with its own funds; it would then sell the loan to IndyMac which in turn would resell the loan into the secondary market, either as a whole loan or as part of a securitized package of loans.

(iii)     Conduit - In the conduit operation, IndyMac purchased loans in bulk from other institutions and resold them into the secondary market.  The Bank relied upon sellers' underwriting of these loans.

402236

5

COMPLAINT FOR NEGLIGENCE

16.     Alternative A ("Alt-A") residential loans was the principal product IndyMac generated or purchased for sale into the secondary market, along with a smaller volume of subprime loans.   These loans included substantial numbers of high-risk "stated-income" and "no documentation" loans.   An Alt-A loan or mortgage is a type of mortgage that carries greater credit risk than A-paper (namely, prime loans).   Alt-A mortgages are characterized by borrowers with less than full documentation, lower credit scores, and higher loan-to-value ("LTV") ratios.

### III.

### Summary Of Plaintiff's Claim

17.     Between at least April and October 2007, defendant Perry failed and neglected to comply with the foregoing duties of a CEO and negligently permitted, and presided over, the Bank's generation of residential loans (either by origination or purchase) for resale into a secondary market.   He did so at a time when he knew the secondary market was uncertain and volatile as to interest in the purchase of such loans. Moreover, these loans had one or more elements of substantial risk, which especially required careful treatment.   Because the Bank could not profitably sell these loans in the secondary market, the Bank transferred 64,699 of the loans totaling $10.9 billion from HFS to HFI in the fourth quarter of 2007 ("transferred loans") and recorded $581 million of mark-to-market losses on the transferred loans at that time.   Subsequently, many of these loans were liquidated; with the loans generated from and after April 1, 2007 causing in excess of $600 million of liquidated losses.

18.     The FDIC-R is informed and believes, and thereon alleges, that additional residential loans were generated up to 2008, beyond the $10 billion pool of loans referred to above, which the Bank originally intended to sell, but, because of the uncertain and volatile secondary market, the Bank was forced to hold for investment rather than selling the loans.   The FDIC-R is informed and believes, and thereon alleges, that such additional loans caused further losses to the Bank in an amount as yet undetermined.

## IV.

## IndyMac's Loans Possessed Layers Of Substantial Risk

19.    Most of the loans at issue were Alt-A loans with a smaller number of subprime loans.   Of the transferred loans, $3.654 billion were Alt-A and $569 million were subprime.   The Bank's loans generated or purchased up to 2008 featured one or more of the following elements of substantial risk, and Perry was fully aware of them and obligated to exercise reasonable care in addressing them, individually and collectively:

(a)    One risk associated with the transferred loans was the lack of documentation of income and assets.  76% of the $10.9 billion in loans transferred in late 2007 to HFI were less than fully documented loans.   66% of the loans were low document loans (e.g., income stated but not verified) and 10% were no document loans (borrower's income and assets were neither stated nor verified).

(b)    The Bank did not underwrite loans purchased from other generators and had to rely upon what the other generator did or did not do as to underwriting; this involved loans IndyMac purchased through its conduit and correspondent channels. Approximately 38% of the loan amounts were generated through the conduit channel and 15% through the correspondent channel.

(c)    Loans which the Bank generated through its conduit operation were particularly risky.  In a Report of Examination, dated January 8, 2007, which Perry received and reviewed, the OTS found that during 2006, the Conduit Division had experienced tremendous growth, accounting for 32.8% of the Bank's loan production. However, the examiners also found that the requisite controls for loan production did not keep pace with growth, as evidenced in two consecutive "needs improvement" internal audits.   The OTS found "significant internal control weaknesses within the Conduit Division.   These Weaknesses were well documented in the [Bank's] 2006 and 2007 internal audit reports.  We have requested that the Board and management ensure that the Conduit Division address and correct these weaknesses."  The Report went on to state:

"[R]equisite controls for loan production did not keep pace with growth, as evidenced by two consecutive "needs improvement internal audits. The Divisions lack of effective internal controls is well documented in the related 2006 and 2007 internal audits, with many repeat criticisms noted. Specifically the Conduit Division failed to: (1) adequately monitor sellers and related exposure; (2) obtain trading approvals according to Bank policy; (3) ensure seller agreements were reviewed by legal staff and properly executed; (4) document compensating factors supporting the purchase of loans not meeting IndyMac guidelines; (5) perform minimum due diligence on all loan pools purchased; and (6) resolve collateral deficiencies identified on a pre-funding basis in a timely manner."

Despite previous knowledge of these derelictions, Perry failed to correct them. Moreover, it is significant that the Bank possessed no effective means of testing the quality of the underwriting purportedly undertaken by the sellers of the loans the Bank purchased in the conduit operation. The Bank's "test" of such underwriting involved selecting one or more loans from a pool of loans and examining the underwriting. If the underwriting was suspect on a loan, the Bank would simply replace the examined loan with another loan. This so called "testing" did nothing to test the quality of the entirety of the pool of loans, for example, by statistical sampling or otherwise. The Bank's deficient "testing" reflected a lack of reasonable care in implementing effective quality control.

(d)     Many loans were in second position (behind first loans) as closed-end, stand-alone second loans or stand-alone HELOCs. In a real estate market with declining values such as existed by at least 2007, the risk of loans in second position becoming undersecured was substantial. Many of the loans in second position were so-called

402236

8

piggyback loans originated concurrently with the first loan (in contrast to stand-alone second loans originated at other times) with a risky combined LTV ratio between 90% and 100% at the time of origination. (A piggyback second loan was used at the time of home purchase to reduce or avoid a down payment and thus "piggybacked" on the loan in first position which was also made at the time of purchase.) Again, such a combined LTV ratio in a declining real estate market was especially likely to lead to the Bank being undersecured. Of the transferred loans, $1.467 billion were HELOCs and $469 million were piggyback seconds.

(e)    Many of the loans had risky repayment schemes that in a time of economic decline, increased the likelihood of borrower default. For example, a substantial number of loans allowed for Option ARMs (adjustable rate mortgages). An Option ARM loan provides the borrower essentially four payment options:

(i)    Minimum Payment: a minimum payment for a set period at an initial interest rate; the payment amount changes annually after the first period according to a selected index subject to a cap on increases or decreases each year; if the payment amount is not sufficient to pay the interest, the unpaid interest is added to the principal (negative amortization), which increased the loan balance and therefore the risk that the loan would become unsecured and the borrower would default;

(ii)    Interest Only: the borrower pays only the monthly interest due or the minimum payment under (i), above, whichever is higher;

(iii)    Fully Amortizing 30 Year Payment:  the borrower pays both principal and interest according to a schedule; monthly payments are calculated based upon a prior month's index rate; and

(iv)    Fully Amortizing 15 Year Payment:  Same as (iii), above, but on an accelerated payment schedule.

The Bank had variations of Option ARM loans referred to as "12 MATs," "Flex Pays" and "Hybrids." In a time of declining real property values and potential increased unemployment, Option ARMs were particularly risky for borrowers and the

Bank.  Borrowers may not be able to afford increased monthly payments that become due under the loan terms, leading to increased defaults on loans potentially undersecured by property with declining values.

        (f)    Loans purchased or generated for HFS would not be put into the secondary market until approximately 90 to 180 days after generation or purchase (the "Delay Risk").  Where the existing secondary market in 2007 was volatile and uncertain, this delay presented a fundamental and growing risk to the Bank; and

        (g)    As Perry has admitted, but only belatedly, the Bank wrongly emphasized production and market share over credit quality and quality underwriting.  In reality, Perry possessed a dismissive attitude toward risk management.  In an e-mail dated May 31, 2005 to senior managers and the board of the Bank entitled "Housing Bubbles, IndyMac Bank, and The Role of Enterprise Risk Management," Perry enunciated his crimped view of the role of risk management:

> "First and simply, I think it is important for people to understand that as long as I am running IndyMac, the bias will always be with long-time, proven senior managers, who are responsible for generating profits. . . . [¶] . . . [¶] I have heard it said that Enterprise Risk Management [ERM] needs to have a bias against taking risk and therefore there should be a "healthy tension" between it and the business unit.  I could not disagree more.  ERM is a part of IndyMac's management team and it works for the CEO and IndyMac's management team in helping it achieve its primary goals. . . . [¶] . . . The bottom line is ERM will be far more effective, if they [sic] focus on the details and facts, not on excessive worry over what the future holds. . . ."

Simply put, Perry negligently elevated his desire to increase the Bank's market share over prudent risk management.

COMPLAINT FOR NEGLIGENCE

## V.

**In 2006 and 2007, Defendant Perry Possessed Knowledge Of An Existing, Volatile And Uncertain Secondary Market**

20.    As long as IndyMac was able to sell loans into a liquid secondary market in the context of increasing real estate prices, IndyMac was able to sell off the risks associated with those loans, including the Delay Risk.  However, despite warnings and knowledge of serious problems in both the housing and secondary markets, defendant Perry negligently allowed IndyMac to increasingly generate risky loans during 2006 and 2007 that were intended to be sold into the secondary market namely, HFS loans.  When the secondary market became volatile and uncertain during 2007, and with declining real estate values, IndyMac was unable to sell these loans in the normal course (and thus was unable to sell the risk) and was ultimately forced to reclassify the transferred loans from HFS to HFI.  In so doing, the Bank recognized that the loans could not readily be sold into the secondary market as originally planned.

21.    In 2007, Perry acknowledged the instability and volatility of the secondary market at the time.  From e-mails and other documented communications dated during the first quarter of 2007, Perry used the following terms to describe the secondary market:  "eroding," "tough," "disaster," "very dislocated," "hurricane," "panic," "poor liquidity," "irrational," "volatile," "challenging," and "illiquid."  These comments were not observations at a single point in time.  Perry made them at various times during the first quarter of 2007.  He made additional follow-up comments similar in tone in the second and third quarters of 2007.  By his comments, it was clear that Perry's eyes were wide open about the risk of not being able to sell loans into the secondary market, and that he regarded the market volatility as not just another minor dip in the market.

22.    Indeed, as early as 2004, Perry was aware of problems in the housing and secondary markets.  Over time, while aware of these conditions and their escalating severity, Perry negligently approved of a gamble:  Instead of acting prudently to pull back and limit the Bank's risk exposure in the face of these deteriorating conditions,

1   Perry saw an opportunity to gain market share in a weakening market, and negligently
2   continued to generate loan production at substantial levels well into 2007.  The level of
3   risk inherent in this course was far greater than reasonable for a safe and sound
4   depository institution.  However, faced with this known risk, Perry pursued a high-risk
5   bid to gain potential market share.  As a former financial officer of IndyMac David
6   Balsam stated in an interview following the Bank's closure, IndyMac distinguished itself
7   in a negative way:

8          "Other people, meaning Wells Fargo and so on, they pulled
9          back.   When Mike [Perry] thought he was winning market
10         share, he wasn't really winning market share – they were
11         relinquishing market share to him . . . .  In their busy-ness to
12         grow, [IndyMac] took on a lot of loans, in some cases very
13         thin-margin loans that were lower quality."

14

15         23.    Ultimately, IndyMac was unable to sell those loans.  In late 2007, Perry's
16   negligence forced IndyMac to reclassify $10.9 billion of loans from HFS to HFI and
17   recognize mark-to-market losses of $581 million.  In summary, had the Bank ceased or
18   otherwise pulled back from the generation of these kinds of risky loans for sale into the
19   secondary market (as other lenders did) instead of rolling the dice on a hyper-aggressive
20   quest to gain a larger share of a dying market, those losses could have been avoided.

21         24.    To more specifically illustrate how Perry failed in this regard, the following
22   contains a chronology and factual recounting of what Perry knew, when he knew it, and
23   how he failed to take appropriate action to protect the interests of the Bank in light of his
24   knowledge.  As early as 2004, Perry was aware of specific warnings about the increasing
25   risk of a financial crisis.  No later than 2007, Perry possessed real-time knowledge as to a
26   then-existing uncertain and volatile secondary market.   These warning signs and
27   deteriorating conditions, which Perry himself recognized at the time, utterly belie his self-
28   serving claims today that he could not have reasonably seen the magnitude of the risks at

1  the time.  Perry disregarded these warnings and failed to apply this knowledge; and, as a

2  result, he made unreasonable, negligent, and harmful decisions adversely impacting the

3  Bank.

4  <u>**2 0 0 4**</u>

5      25.   On August 9, 2004, via e-mail, Perry forwarded to senior managers certain

6  comments of Joe Garrett, an industry consultant and sometime confidant of Perry.  Perry

7  also forwarded responsive comments of Jim Nichols, a Bank management employee.

8  Garrett had expressed his opinion that middle class homeowners were using housing

9  equity in their homes to finance consumer spending, i.e., refinancing to pay off consumer

10  debt – all leading to personal bankruptcies.   Jim Nichols responded to Garrett's

11  comments, asserting that he had been "preaching" this same thing for years "but

12  fortunately (or unfortunately because it will just ultimately be worse) the rise in home

13  equity has delayed the issue. . . .  I would be a Seller of credit risk, particularly on high

14  LTV firsts and seconds. . . .  **Call me a pessimist, but I've been through four cycles**

15  **and the bill ultimately does come due."**  (Emphasis added.)  Perry's forwarding of these

16  comments to senior managers reflected his belief that these warnings were material and

17  worthy of consideration.  Replying to Nichols, Perry paid lip service to this warning: "the

18  challenge is how do we continue to aggressively pursue our business . . . . yet mitigate

19  this risk for IndyMac . . . I tend to agree with Jim . . . ."

20      26.   On September 3, 2004, Perry received an article from an industry journal,

21  the American Banker (which Perry forwarded by e-mail to senior managers) that noted

22  that with the refinance boom being over, some lenders were loosening standards and

23  making loans to risky borrowers.  As a result, mortgage insurers were already becoming

24  increasingly unwilling to provide coverage.  In a September 7, 2004 e-mail, Perry asked

25  senior management about this warning sign, which he regarded as material: "Have we

26  gone too far and are we taking on too much risk for short-term volume gains here?

27  Please review with me your thoughts in person sometime this week. . . P.S.  The last

28  really tough market . . .. we did a lot of production we later regretted."

## 2 0 0 5

27.   On June 16, 2005, Perry transmitted by e-mail an article to senior managers entitled "The Trillion Dollar Bet."  The article expressed concern about $80 billion in ARM (adjustable rate mortgage) debt coming to the end of the fixed rate period in 2005 with another $300 billion to reset (essentially an increase in mortgage payments) in 2006 and $1 trillion in 2007.  A reasonable banker of a depository institution would have understood that the risk of this massive group of mortgages "resetting" would pose significant risks to the mortgage and housing market in which IndyMac was a major participant.

28.   Perry transmitted a June 22, 2005 e-mail to senior managers containing links to certain articles that he regarded as material.  One article, entitled "U.S. Housing Bubble May Pop," noted that new reports from Merrill Lynch, University of Maryland and UCLA Anderson Forecast Project "indicate the possibility of a housing bust by the end of the year, jeopardizing growth in the job market and the overall U.S. economy."

### August 2005

29.   Commencing as early as August 30, 2005, Bank of America lowered its rating of Bancorp from "Buy" to "Neutral."  It did so based on (a) a predicted downturn in credit quality and (b) IndyMac's focus on both Alt-A products and arbitrage because IndyMac's profit was so dependent upon the price differentials at which it could buy and sell mortgages.  Perry was aware or should have been aware of this negative rating change.

30.   On August 30, 2005, Perry forwarded to senior managers, among others, an article reporting on comments Alan Greenspan made at the Jackson Hole Fed Policy Conference.  According to the article, which Perry deemed to be material, the Federal Reserve Chairman described the housing boom as an economic imbalance that could end badly.  Greenspan warned that asset values could fall if investors grew cautious and demanded higher interest rates.  The article cautioned:  "What [market participants] perceive as newly abundant liquidity can readily disappear."

14

COMPLAINT FOR NEGLIGENCE

**September 2005**

31.   In a September 15, 2005 Standard and Poor's article entitled, "Banks' Capacity To Withstand A Housing Bubble 'Burst': So Far, So Good," Victoria Wagner noted that industry moves to riskier lending were based upon a false belief that residential real estate values would continue to rise.  She opined that, "[t]o the extent low interest and mortgage rates and loosening underwriting standards have buttressed real estate values, all lenders are vulnerable to a declining credit profile in their residential mortgage portfolios should housing values drop."  Perry forwarded the article, which he regarded as material, to senior managers by e-mail on September 19, 2005.

32.   In a September 15, 2005 e-mail, Perry reported to senior managers what material information he had learned at a Lehman Brothers Financial Services conference that he had personally attended:

> "The bottom line is there is significant pessimism regarding the mortgage industry . . . almost universal pessimism . . . except, naturally, a couple of our largest shareholders.
>
> In a nutshell, most investors think we have a housing bubble in the USA (caused by the mortgage industry's aggressive lending . . . option arms) that will soon burst, that the regulators will pile on and restrict home lending products, that rates will rise and industry volumes will be crushed and margins further compressed, that Fannie Mae and Freddie Mac **and the secondary market for mortgages will collapse due to oversupply of mortgage investments and investor losses**, and that IndyMac will face huge competition and marging [sic] compression in its core Alt-a business . . . . and by the way, all of these will occur in the near future."

COMPLAINT FOR NEGLIGENCE

(Emphasis added.)

33.    Additionally, in his September 15, 2005 e-mail to senior managers, Perry asks rhetorically, "what should we do?"  His glib answer was to have the Bank make a risky bet of "heads we win, tails they lose": "Sort through all of the hype, be prudent about risk and return, and keep executing on our business model.  Most of you know that I am not an ardent optimist about anything (more a realist), but I have a strong feeling that most (probably not all) of the 'gloom and doom' will be far more mild than is currently being forecasted by the market.  If I am right, you should see our earnings grow and our P/E multiple expand and our stock move up very nicely . . . .  **If I am wrong and they are right, the entire industry will be in for a rough ride and I am confident we will get stronger than most everyone and come out the other side very strong and profitable . . . . with a bigger share of the market sooner than we forecast."**  (Emphasis added.)   In other words, Perry was in effect asserting that the Bank should make a bet that IndyMac had only upside to look forward to, and no downside.  Such extreme Pollyanna decision-making falls far short of reasonable safe and sound banking practices.

## 2 0 0 6

### April 2006

34.    Perry presided over the April 25, 2006 IndyMac earnings conference call for the first quarter of 2006.  In the call, he noted that "[t]he mortgage market year-over-year industry volumes declined from $620 billion in the first quarter of 2005 to $514 billion this year.  So all other things being equal that's clearly a negative for our business."  Perry also observed that spread had declined from a 164 basis point spread a year earlier to a negative 5 basis point spread at that time – essentially a flat yield curve.  "That's obviously another big negative for financial institutions."  Mortgage revenue margin declined 40% year-over-year.  "So the point that I'm making is the environment for our business, both our mortgage banking business and our thrift business, was decidedly negative . . . ."

35.   Perry continued in the April 25, 2006 Bancorp earnings conference call: "I think **credit losses in our industry have nowhere to go but up** over a period of time" (because housing price appreciation will cease). (Emphasis added.) Perry asserted: "It could be a little bumpy here in the next year or two as the mortgage market transitions to a more normal market." Perry admitted that "we are forecasting our margins for the year to be down about 15% versus last year. . . . .  I think we're going to see that housing prices are going to abate.  We don't expect a housing bubble to burst but I think we're going to see housing prices slow, at least the growth and that's going to ultimately increase credit losses."  Perry optimistically concluded: "So the bottom line is while we may . . . all we have to deal with now is a little bump in the road in terms of the mortgage market transitioning to a more normal market."  Ironically, a few months later, Perry himself would be describing the "bump" as a "hurricane" and a "tsunami."

### July 2006

36.   In an e-mail dated July 20, 2006, to certain Bank personnel, Perry acknowledged "real estate values are softening and credit losses are likely to grow."

37.   In his second quarter update for 2006 provided in late July to IndyMac's board of directors and others Perry stated: "The stock market seems to be climbing a 'Wall of Worry' related to the housing and mortgage sectors."  While expressing his belief in a continued strong housing demand, Perry asserted "[n]onetheless, the markets remain nervous, and the bottom line is that the market doesn't like uncertainty and is discounting both homebuilder and mortgage related stocks."  He noted that mortgage volumes were flat from the previous quarter and further acknowledged that (a) "[i]ndustry volumes are well below last year and are expected to decline further," (b) the industry "has definitely slowed down from last year," and (c) the Mortgage Bankers Association predicted further decline.  Perry also observed that "[t]he market's concerns with the housing and mortgage markets is not only that the mortgage volumes could decline but also that credit losses could rise."

**October 2006**

1      38.     An October 5, 2006 <u>Realty Times</u> article summarized a report from <u>Economy.com</u>, which the Bank allegedly relied upon from time to time for forecasting, stating that the site "has just released the gloomiest report yet and in the process, recalls the Dark Ages of the national economy." Perry was aware or should have been aware of the information in the article. The <u>Economy.com</u> report "says the nation's housing market will slip like it hasn't slipped since the Great Depression, with home price declines in 2007 approaching 20 percent in some areas where the word 'crash' could replace 'soft landing.'" The report noted that new and existing home sales and single family housing construction were sliding, inventories of unsold homes were surging to new record highs, and house prices were falling in an increasing number of areas. The <u>Economy.com</u> report stated: "Housing's problems began just over a year ago when activity peaked, but have increased substantially in recent months. The bright optimism of home buyers, builders and lenders has abruptly devolved into increasingly dark pessimism."

**November 2006**

39.     On his November 2, 2006 Bancorp earnings conference call for the third quarter of 2006, Perry admitted that the market was tougher than expected. Home price increases had abated and in some markets prices were declining. Market production declined 29% and was down 14% from the second to the third quarter. "[I]f we are in for a prolonged extremely negative housing market[,] that certainly could impact our business and our margins."

**2 0 0 7**

**January 2007**

40.     On January 11, 2007, in an e-mail to certain Bank personnel regarding fourth quarter 2006 earnings, Perry stated: "Unfortunately, we are starting the year off with some bad news." Earnings "plummeted." He noted that the Bank was "in a very challenging market for housing and the mortgage business" in which many mortgage

18
COMPLAINT FOR NEGLIGENCE

companies and mortgage divisions of major financial institutions were reporting significant losses.

41.   In Bancorp's January 16, 2007, 8-K, containing a shareholder letter regarding 2006 results, Perry again addressed the lower than forecast earnings per share for the fourth quarter of 2006, attributing the shortfall to "the challenging times being faced by the mortgage and housing industries and the difficult nature of forecasting earnings in our business." It was clear that during the fourth quarter of 2006, "industry conditions continued to erode."

42.   In a January 25, 2007 earnings conference call related to the fourth quarter of 2006, Perry again admitted a challenging market ("it's tough out there right now") and discussed its impact on IndyMac. Perry even acknowledged the inaccuracy of previous management assessments of economic conditions. Perry made the following comments and observations on the call:

> "[Why were estimates missed badly in the fourth quarter?] I think that it's a combination of the market getting worse, and also that our forecasting process may be we had a little hubris in terms of our forecasting process."

> "Our provision for loan losses is increasing. . . . Credit quality generally is deteriorating so I would say that's something we have to do a better job forecasting and clearly we want to be a little more conservative as it relates to that."

> "And then in the thrift, clearly that 14% return led by lower returns on our loans held for investment in a [mortgage backed securities] portfolio is approaching a level that in my opinion is unacceptable and so we're going to be looking at that."

COMPLAINT FOR NEGLIGENCE

"When you look at their mortgage segment results out there, it's a **disaster** out there in the mortgage business right now."

"If you look at, you know, the marketplace out there, you know, it is a **very dislocated** mortgage market."

"This is a business that probably every five or six years has a **hurricane.**  It has low barriers of entry to get into this business, but there are very high barriers to stay in this business. . . ."

"We are moving through this **hurricane** and yes, it is impacting our earnings in the short run. . . ."

"[T]here's a lot of **dislocation** in the mortgage business. Basically below the top 10, there aren't very many mortgage companies even profitable right now. . . ." (Emphasis added.)

43.    In a press release dated January 25, 2007, related to the earnings conference call, Perry asserted that the Bank was blindly flying into significant and unknown downside risks: "[n]o one knows for sure how long the current downturn will last and how severe it will get . . . ."  He also confirmed that market conditions had resulted in increased credit cost and narrower net interest and mortgage banking revenue margins.

## **February 2007**

44.    On February 8, 2007, Perry received a lengthy list of mortgage industry business failures and layoffs due to disruption in the secondary market.

45.    In a February 16, 2007 e-mail to senior managers entitled "Update on the Secondary Market," Perry noted that "we understand that a couple of Wall Street firms

1    plan to issue reports next week very critical of the Alt-A marketplace." He asserted that

2    "there is a strong odor of **panic** in the marketplace." (Emphasis added.)  The Bank was

3    "not immune to disruptions in the secondary market." "It is really choppy out there. . . .

4    please 'batten down the hatches' and let's protect our franchise. . . I [Perry] am not going

5    to tolerate any excessive risk taking."  Yet, with this knowledge, Perry touted that the

6    Bank was "doing about $1/2 billion a month of subprime production (5% to 8% of your

7    total monthly production)."

8                                        **March 2007**

9            46.    On March 1, 2007, Bancorp filed an 8-K with the Bank's 2006 annual

10   shareholder letter updating the Bank's 2007 forecast.  Perry stated that the purpose of the

11   letter was to provide an update "in light of the current volatile conditions in the mortgage

12   market."  He noted that industry volumes were 34 percent below 2003's "historic high

13   level" and 17 percent lower than in 2005 and predicted a decline in earnings in 2007.

14   Notwithstanding the conditions in the market, which Perry had recently characterized as a

15   "hurricane" on January 25, 2007, Perry's proposed corrective action was merely to "fine

16   tune" IndyMac's hybrid model.  Stating that it did not make sense to grow the thrift

17   portfolio, Perry asserted that "our capital deployment and profit growth will be more

18   focused in the future" on the mortgage banking business, i.e., mortgage production and

19   servicing.  Thus, Perry was expressly acknowledging that IndyMac would continue to

20   generate and sell loans of a kind that he would not even want to hold at that point in

21   IndyMac's own portfolio.  One of the six elements of the Bank's game plan was to

22   "continue to profitably grow mortgage production."  Yet, mortgage banking still requires

23   a secondary market.  In fact, as a mortgage bank, IndyMac originated loans specifically

24   for sale into the secondary market.  This is precisely why mortgage bankers must be

25   keenly aware of price and liquidity dynamics of the secondary market.  Yet Perry pressed

26   the Bank to pursue a high-risk bid to gain potential market share.  Continuing to grow

27   mortgage production in the hurricane of a volatile market negligently exposed the Bank

28   to extreme and unreasonable risks.

402236

COMPLAINT FOR NEGLIGENCE

47.     Bancorp's March 1, 2007 10-K, the annual report for 2006 reviewed and approved by Perry, included the disclosure that IndyMac experienced an increase in retention of securities and loans in the Bank's HFI portfolio.  The 10-K stated that the Bank's business model relied on the ability to sell the majority of mortgage loans into the secondary market.  The 10-K acknowledged that disruption in access to these markets "could negatively impact our liquidity position and our ability to execute on our business plan. . . .   A lengthy disruption to [the secondary market] may require us to **radically restructure our 'business' to slow volume** and we would have difficulty sustaining our earnings performance as a significant portion of our earnings depends on our ability to sell our mortgage production."  (Emphasis added.)  Indeed, the risk factor was coming to fruition where the volatile secondary market increasingly was disinterested in the purchase of IndyMac's products.

48.     In a March 2, 2007 e-mail to senior managers and others, Perry attached a Keefe, Bruyette & Woods report which Perry described as containing a "reasonable pessimist's view of our business."  The report rated Bancorp's shares as "underperform" because of IndyMac's weaker loan production, higher credit costs and the pressure on gain on sale margins.  The report stated: "The aggressiveness of IndyMac's underwriting in 2006 is still underappreciated, in our view.  While NDE [ticker symbol for Bancorp stock] retains only a modest amount of credit risk on balance sheet relative to overall loan production, we think a meaningful portion of loan volume that was sold for profit in 2006 **will meet a more hostile secondary market in 2007."**  (Emphasis added.)  Commenting on the report, Perry stated that it could not be dismissed as "being pessimistic."  He observed that other lenders (such as Fremont, New Century, Accredited, Countrywide and GM's mortgage unit) were having a very difficult time as well.  Perry referred to "rumors going around that Goldman and Merrill have lost roughly a billion each in the mortgage biz."  However, for Perry, this "hurricane" - this "panicked" market - was an opportunity to gain market share that was being relinquished by others:  "[T]he big positive long-term is there won't be a lot of competitors left and margins should be

1  healthier as a result . . . and many of the Wall Street firms (who were hot on the mortgage
2  biz the last few years) could abandon their origination platforms."

3        49.    On March 12, 2007, in an e-mail entitled "Mortgage Banking Credit Risk
4  Management:  Part I, The Big Picture," which he transmitted to Bank personnel, Perry
5  concluded:  "We have seen the peak of the private securitization market for the time
6  being."  He asserted that **"[a]s a result of poor liquidity in the private securitization
7  market, . . . IndyMac and all major mortgage bankers will be retaining (at least
8  temporarily) more credit risk securities . . . ."** (Emphasis added.)  Perry opined that
9  this would test credit risk management and result in more lenders exiting the business.
10 Yet, according to Perry, IndyMac would inevitably survive and ultimately gain market
11 share.

12       50.    In a March 15, 2007 press release, included in a Bancorp 8-K, Perry
13 expressed the view that IndyMac's non-performing assets ("NPAs") could rise; and,
14 because the secondary market was less liquid, the Bank "may elect" to keep more NPAs
15 on its balance sheet and work them out rather than sell at fire sale prices.  Perry noted that
16 the Bank's NPA forecast included an expectation that loan repurchases would rise in the
17 coming quarters as a result of a combination of **increased production volumes** (over
18 which Perry had management control), Wall Street firms becoming more aggressive on
19 repurchase demands, and credit deterioration.  He acknowledged:  "Again, if conditions
20 in the housing and mortgage markets worsen substantially from our current expectations,
21 this could have a material adverse impact on our earnings from our current earnings
22 forecast."  Concluding, Perry admitted:  "Clearly, the mortgage market and, in particular,
23 the secondary market for mortgages are in a state of irrational panic right now, making it
24 virtually impossible to predict short-term loan production and sales volumes or earnings
25 with any reasonable precision until things settle down. . . ."  Notwithstanding this bleak
26 portrait of a high-risk environment, Perry was still looking to gain market share.

27       51.    Perry admitted in a March 29, 2007 e-mail to certain Bank personnel that
28 'the secondary markets are illiquid right now" and very volatile.  In an April 1, 2007 e-

COMPLAINT FOR NEGLIGENCE

mail, Perry acknowledged that "it is tough out there to sell loans and we are having to retain more credit risk securities . . . ." He stated that the Bank was flying blindly into significant and unknown risks in the secondary market: "we don't really know how long the market could be disrupted or the exact volume of loans and non-investment grade securities we may need to retain. . . ." However, IndyMac's loan production for March 2007 was $8.96 billion which, according to an IndyMac report, "ranked second to December 06 all time high of $9.04 billion." This same report boasted that "[t]otal production for the 1st quarter ranked as the second biggest production quarter for IndyMac at $25.9 billion . . . ." The disconnect between the market signals which Perry received and acknowledged, and IndyMac management's actions (i.e., to build up "inventory" at near record levels when there were no buyers) did not manifest ordinary or due care on the part of Perry -- especially where Bancorp's own March 1, 2007 10-K, reviewed and approved by Perry, stated that the Bank had the feasible, reasonable option to "radically restructure our 'business' to slow volume."

52. In March 2007, Morningstar warned that Bancorp would face difficulty due to a deteriorating market and rising delinquency rates and that Bancorp could face short-term liquidity issues. Perry was aware or should have been aware of this warning from Morningstar, a prominent source of market information.

## April 2007

53. In April 2007, New Century Financial Corp. filed for bankruptcy under Chapter 11. In reporting the bankruptcy, the Wall Street Journal noted that dozens of subprime lenders had exited the business in the previous four months, and that Alt-A lender SouthStar Funding LLC had just ceased operations. In an e-mail to customers quoted by the Wall Street Journal article, a SouthStar executive stated in words that could have emanated from the mouth of Perry more than a year later: "We really felt like we could weather the storm and that we would outlive some of the competition." The executive then added, "Wall Street's appetite for the Alt-A and subprime market disappeared." Perry was aware of should have been aware of this information. The risk

1    posed by the possibility of this failure should have been no surprise to Perry.

2       54.   On April 20, 2007, Perry received an e-mail referencing a Bloomberg article

3    which noted, inter alia: "More than 50 subprime lenders have halted operations, gone out

4    of business or sought buyers since the start of 2006, as borrowers fell behind on monthly

5    payments at the fastest rate in four years.  Alt-A lenders, which cater to more-credit-

6    worthy borrowers who can't produce the forms needed to qualify for a prime loan, also

7    have encountered higher default rates and losses."

8       55.   On April 20, 2007, Perry learned from an article in American Banker Online

9    that Opteum (an Alt-A lender) closed its wholesale and conduit lending businesses and

10   laid off 257 employees because of its inability to sell Alt-A mortgages at a profit in the

11   secondary market.

12      56.   In a Bancorp press release contained in an April 26, 2007 Bancorp 8-K,

13   Perry noted that many mortgage companies had failed.  The release recognized that the

14   Mortgage Bankers Association predicted that industry volumes would be down 11

15   percent in the second half of the year over the first half and down 16 percent from the

16   second half of 2006.  Scott Keys, IndyMac's chief financial officer, stated: "Please keep

17   in mind that the housing and mortgage markets, including the secondary market for

18   private mortgage backed securities, remains [sic] uncertain, and, as a result, we are

19   internally updating our forecast almost weekly. . . .  Lastly, it should also be pointed out

20   that some are predicting a 'doomsday scenario' for the housing and mortgage markets.

21   Although we believe this to be unlikely, if that were to occur, our financial performance

22   could worsen materially from what we are currently forecasting."

23      57.   Also, on April 26, 2007, Perry conducted a Bancorp earnings conference call

24   in which Perry acknowledged a sharp increase in NPAs for the quarter and that it was a

25   "[v]ery difficult time for our business."

26                                      **May 2007**

27      58.   On May 1, 2007, Roth Capital Partners lowered its rating for Bancorp from

28   "Hold" to "Sell." The report focused on IndyMac's exposure to Alt-A loans, and on how

1   the mortgage banking industry would shake out in a prolonged housing slump after many

2   profitable years.  Perry was aware or should have been aware of this major rating change.

3       59.    On May 2, 2007, Perry received an e-mail with an article regarding lender

4   GMAC's $305 million first quarter loss on home loans.  In an e-mail chain between May

5   20 and 22, 2007 with the IndyMac executive committee, Perry observed:  "The bottom

6   line is I believe we have to substantially 're-work' our business model for 'headwinds'

7   for as 'far as the eye can see.'"  He also noted, inter alia, that the Bank would need to sell

8   loans faster.  A May 25, 2007 Dow Jones report which Perry transmitted to Bank senior

9   managers asserted that existing home sales retreated in April, "dropping to the lowest

10  pace in nearly four years in another negative sign for the slumping housing sector."

11                              **June 2007**

12      60.    In a June 8, 2007 e-mail to Bank personnel, Perry admitted that no one

13  knows how long "these bad times will last."  As to the "current headwinds" the Bank was

14  facing, he asserted that "we must conservatively assume [they] will last a long time."  On

15  June 13, 2007, Perry noted in an e-mail to senior managers that Lehman was laying off

16  400 people and combining its Alt-A and subprime operations.  "It is reports like this, plus

17  the malaise in housing, rising foreclosures, and declining mortgage volumes that are

18  putting our stock back down."     Nonetheless, with all of the disconcerting news,

19  IndyMac's production remained substantial: for April 2007, $8.8 billion (up 36.7% from

20  April 2006), for May 2007, $7.2 billion (up 1.7% from May 2006) and for June 2007,

21  $7.2 billion (down only .6% from June 2006).   Total loan production for the second

22  quarter of 2007 was $23.2 billion, 11.6% over the second quarter of 2006.  Paradoxically,

23  even while Perry was acknowledging increased risks and talking about being

24  conservative and re-working the business model, Perry instead chose to "double down."

25                              **July 2007**

26      61.    On July 13, 2007, Perry had a conversation with Angelo Mozilo of

27  Countrywide Financial Corp. which he relayed to the Board and executive committee on

28  the same day.  Perry reported that Mozilo stated: "'Mike, I am not sure I can't [sic] see a

bottom here.'"   Perry commented to the recipients:   "[W]e both agreed that while the housing market . . . may take all the way through next year to see any stabilization . . . that the bottom for our earnings likely will be one of this year's quarters (unless things really spiral out of control) . . . . [¶] Not great news . . . ."

62.   On July 18, 2007, Perry received a Lehman report downgrading Bancorp's rating from "market perform" to "neutral."  Lehman noted "continued pressure on gain on sale margins and rising credit costs in Alt-A."  It observed rising NPAs "on thin demand among distressed asset investors" and predicted credit losses would increase due to "higher percentage of NPAs that IMB will keep on b/s v. [balance sheet versus] sell off."

63.   In an e-mail chain between July 19 and July 21, 2007, with Bank personnel, Perry announced a reduction in force of 400 employees (4%) as a result of a continuing very tough market.  In one of the e-mails included in the chain, senior IndyMac officer Frank Sillman affirmed that volume was not slowing down:   "[t]he volume in the Mortgage Bank is strong and that we're at an All Time Record Pipeline measured by volume."  However, he noted "[t]he Secondary Market is again temporarily experiencing thinner liquidity in both Prime and Sub Prime loans."

64.   A Wall Street Journal article, dated July 24, 2007, concerning Countrywide, transmitted to the Bank's senior managers including Perry as material information for the Bank to consider, reported that Countrywide had a 33% drop in second quarter income and slashed 2007 earnings outlook "on expectations of 'increasingly challenging' housing and mortgage markets."   The article quoted Countrywide CEO Mozilo:   "During the quarter, softening home prices continued to affect many areas of the country and delinquencies and defaults continued to rise across all mortgage product categories as a result."   The article also related that

> "Countrywide said it expects the second half of this year to be 'increasingly challenging' for the mortgage industry and the company.  It expects loan volumes to fall and pricing pressures

to increase. In addition, the lender also noted increased volatility in prices paid by investors who buy mortgages in the secondary market as well as plunging investor demand for bonds backed by risky mortgages. Those conditions, it warned, could further squeeze its profits from selling loans."

65. On July 26, 2007, Perry sent an e-mail to senior managers: "As we are well aware, we are back in the 'frying pan' again!!!"

66. Perry received an article on July 27, 2007, which quoted Mark Zandi of Economy.com saying that the problems in the U.S. subprime mortgage market were only the beginning of what could spiral out of control into a global financial crisis. "We could be just one hedge-fund collapse away from a global liquidity crisis."

67. Perry conducted a Bancorp earnings conference call on July 31, 2007, for the second quarter of 2007. Perry acknowledged that the Bank was "reliant on our ability to sell loans into the secondary market and we all understand that the secondary market, at least the private label secondary market is quite disrupted right now. . . ." He noted poor secondary market liquidity and volatility with wider spreads that could negatively impact margins in the third quarter. Looking at the remainder of 2007, Perry expressed the belief that credit tightening and illiquidity will continue. Perry predicted IndyMac and some others would survive "unless we have the doomsday scenario where this credit cycle creates a deep housing bust."

## August to December 2007

68. In an August 1, 2007 e-mail to Bank personnel entitled "Conditions in the Private Secondary Markets and Their Implications for our Industry and IndyMac," Perry stated: "Unfortunately, the private secondary markets (excluding the GSEs and Ginnie Mae) continue to remain very panicked and illiquid. By way of example, it is currently difficult, at present, to trade even the AAA bond on any private MBS [mortgage backed security] transaction." (GSEs refers to Government Sponsored Enterprises which include

402236

COMPLAINT FOR NEGLIGENCE

1   Freddie Mac and Fannie Mae; Ginnie Mae is the Government National Mortgage
2   Association.)   Perry continued by noting that other lenders were slowing their loan
3   volumes and re-working their business models:

4              "Unlike past private secondary market disruptions, which have
5              lasted a few weeks or so, our industry and IndyMac have to be
6              prudent and assume that this present disruption, which appears
7              broader and more serious, might take longer to correct itself.
8              As a result, we have seen just since yesterday, many major
9              mortgage lenders announce additional product cutbacks, some
10             leaving subprime, Alt-a and other products altogether or
11             restricting some products to only their own retail channel (and
12             possibly wholesale) and additional price widening."

13

14   Additionally, Perry stated: "[W]e cannot continue to fund $80 to $100 billion of loans on
15   a $33 billion balance sheet, unless we know we can sell a significant portion of these
16   loans into the secondary market, and right now, other than the GSEs and Ginnie Mae, **the**
17   **private secondary market is not functioning**." (Emphasis added.)

18       69.   Yet, despite this acknowledgement, Perry confirmed in his August 1, 2007
19   e-mail that **"[w]e will still originate product that cannot be sold to the GSEs, just less**
20   **of it and we will have to assume we retain it in portfolio (until the AAA private MBS**
21   **market recovers)."**   (Emphasis added.)   Unbelievably, Perry expressed the intent to
22   continue to generate additional product for which he admitted in the same writing, there
23   was no market.

24       70.   American Home Mortgage Investment Corp. ("AHM") filed for Chapter 11
25   bankruptcy protection on August 6, 2007.   The bankruptcy filing was precipitated by
26   AHM's creditors cutting off funding and demanding repayments, according to an August
27   7, 2007 Wall Street Journal article.   AHM was the 10th largest retail mortgage lender in
28   the country, specializing in prime and near-prime loans.   AHM's bankruptcy

402236                                    29

1  demonstrated that the market downturn was affecting more than just subprime and Alt-A
2  lenders.  Perry was aware or should have been aware of this information.  At about this
3  same time, the Bank substantially increased its insured deposits by several billion dollars.

4      71.   In a September 2007 shareholder letter, Perry stated:

5          "In our second quarter earnings release, we said that the second

6          half of 2007 and 2008 would continue to be challenging for the

7          mortgage and housing markets and for IndyMac.  In fact, the

8          mortgage and housing markets are very difficult, and the private

9          secondary markets have significantly worsened.  The illiquidity

10          in the secondary markets, and the consequent significant and

11          abrupt spread widening for all mortgage products except those

12          saleable to the GSEs, have negatively impacted the profitability

13          of our mortgage production division."

14

15      72.   Perry presided over Bancorp's November 6, 2007 earnings conference call,
16  and declared that although the industry had been hit with a "tsunami" that "wipes just
17  about everybody off the face of the planet[;] . . . it didn't wipe us off in '98 [during an
18  earlier banking slowdown] and it's not going to wipe us off this time."  In a November
19  20, 2007 e-mail chain, in commenting on a conference he attended, Perry stated:  "I think
20  it was a Perfect Storm of too much Fed easing, tremendous global liquidity, **and too**
21  **aggressive of product innovation in the mortgage market** . . . . roughly equally that
22  has led us to where we are today."  (Emphasis added.)

23      73.   It is significant that, throughout this time, Perry and the Bank possessed
24  substantial data indicating increasing delinquency trends.  The Bank's Thrift Financial
25  Reports ("TFR") showed substantial increases in first lien delinquencies on loans 30 -89
26  days past due and still accruing, increasing 128% from the second to the <u>fourth</u> quarter of
27  2006.  With respect to HELOCs, the TFRs showed a 93% increase in such delinquencies
28  from the second to the fourth quarter of 2006.  Delinquencies in first lien loans began to

COMPLAINT FOR NEGLIGENCE

1   increase dramatically in the third quarter of 2006.  In the following quarter, non-accrual

2   loans also began to trend significantly upward indicating a low delinquency cure rate.

3   Non-performing assets as a percentage of total assets increased 73% between the fourth

4   quarter of 2006 and the first quarter of 2007.  Between the third quarter of 2006 and the

5   first quarter of 2007, the increase was more pronounced at 114%.  Such trends indicated

6   increased exposure to delinquencies and non-performing assets compared to historical

7   levels and warranted prompt corrective action no later that the first quarter of 2007 in

8   order to mitigate risk and avoid loan losses.

9                                                    **VI.**

10   **Defendant Perry Negligently Continued To Generate Risky Loans For Sale With**

11   **Knowledge That The Secondary Market Was Uncertain And Volatile**

12        74.    Despite the admitted uncertainty and volatility of the secondary market, and

13   despite the acknowledged option of slowing down loan volumes and re-working the

14   business model, IndyMac's annual loan production for 2007 was still in the multiple tens

15   of billions of dollars and comparable to production in 2006.  What is most disturbing is

16   that so much of the production was still Alt-A, nonprime, HELOCs and seconds, for

17   which there was no stable secondary market serving as a purchaser of these loans.

18        75.    It is significant that it took from 90 to 180 days from generation of the loan

19   to the sale or securitization of a loan.  The magnitude of this Delay Risk had dramatically

20   increased by late 2006 and early 2007 due to market instability.  Perry understood that the

21   uncertainty of the secondary market had fundamentally changed the Delay Risk.  Rather

22   than respond prudently to this increased risk, Perry imprudently pursued a strategy to

23   keep volumes pumped up and to increase market share -- in an increasingly illiquid

24   market that admittedly could not absorb such volumes.  In this context, for Perry to

25   permit the Bank to generate risky loans for sale 90 to 180 days later into a then known (in

26   real time) existing, uncertain and volatile market was negligent.

27

28        76.    In addition to the foregoing, it is notable that given market conditions, the

402236
COMPLAINT FOR NEGLIGENCE

Bank did substantially reduce certain risky product lines such as closed-end, stand-alone second loans during 2007; but inexplicably, at the same time, the Bank failed to reduce other risky product lines such as stand-alone HELOCs and piggyback HELOCs. Moreover, the Bank continued to produce a significant number of piggyback closed-end second loans through July 2007. The Bank was forced to transfer from HFS to HFI a large number of these HELOCs and seconds in the last quarter of 2007. The Bank incurred substantial losses from these transferred loans. Perry possesses no legitimate explanation as to why the Bank curtailed closed-end, stand-alone seconds in response to market conditions, while arbitrarily failing to curtail HELOCs (stand-alone and piggybacks) or piggyback closed-end seconds.

77.   As a consequence of the Bank's inability to sell loans into the secondary market, and as Perry admitted in his February 2008 earnings conference call discussing 2007 results: "[The Bank] transferred - of the $13.9 billion in loans that we had held for sale at 9/30, we transferred at November 1 **$10.9 billion of those loans and took lower cost or market basis adjustments of $581 million on that portfolio, essentially transferring $10.3 billion to our held for investment portfolio.**" (Emphasis added.) As admitted in the Bank's Fourth Quarter Review, these loans were transferred to HFI because they could not be sold in the secondary market. In connection with this transfer, the Bank and FDIC-R subsequently incurred in excess of $600 million of liquidated losses on these loans.

## VII.

### Perry Admitted To Errors

78.   Perry was quite candid in various comments regarding the failings of IndyMac's management, including himself. In a January 31, 2007 e-mail, Perry wrote that his "support for volumes and profits at the expense of less than fully professional business practices is over." This acknowledgement, while late, would have reduced losses had professional business practices been meaningfully implemented. They were not. Instead the Bank continued to generate loans in 2007 that it was unable to sell into

1 the secondary market.

2      79.    In a February 21, 2007 e-mail to senior managers and others regarding credit

3 risk management at IndyMac, Perry noted that a "robust housing market and highly liquid

4 secondary markets both of which have persisted for years longer than anticipated, and

5 strong competition in a declining overall mortgage market, resulted in IndyMac

6 **loosening its lending standards too far and in some cases mis-pricing actual credit**

7 **risk."** (Emphasis added.)  Perry rationalized this by IndyMac's need to compete in the

8 (shrinking) marketplace. With modest understatement, Perry admitted that he had seen

9 "a weakness in our senior management team in their overall command and control of

10 credit risk."

11      80.    On March 14, 2007, Perry disseminated an e-mail to Bank personnel with

12 his ruminations on the role of mortgage banking.  He asserted that in the then present

13 "difficult market environment," IndyMac's approach to managing credit risk has shown

14 fundamental weakness. "Clearly, in hindsight, this system allowed IndyMac to loosen its

15 loan program guidelines too far (although less than most other major players), which has

16 resulted in excessive EPDs [early payment defaults which require a bank to repurchase a

17 loan sold if the loan becomes delinquent within a certain number of days after sale as

18 specified in the purchase/sales agreement], credit losses and repurchase risk.  In addition,

19 very few managers in the mortgage bank, including secondary marketing, had the level of

20 command and control of credit risk that I would call 'best practices.'"  Perry asserted that

21 he began to ask questions "[a]s credit risk emerged as an important issue in January of

22 this year."

23      81.    In an April 19, 2007 e-mail transmitted to Bank managers regarding a

24 negative market research report on IndyMac by Keefe, Bruyette & Woods, Perry

25 confirmed:  **"Yes, we loosened our credit guidelines too much over the past year or**

26 **so . . . ."**  (Emphasis added.)

27

28      82.    During Bancorp's April 26, 2007 earnings conference call, Perry

COMPLAINT FOR NEGLIGENCE

1 acknowledged: "clearly we expanded guidelines in the piggyback area, which, you
2 know, primarily was 80/20s and a lot of those were Alt-As and performance on those was
3 horrible, okay?"  In a July 3, 2007 e-mail chain, Perry admitted the Bank made a mistake
4 in generating piggyback loans: "Boy, those piggyback loans (almost all our 2nds are
5 related to piggybacks) have really cost us a lot . . . both in earnings and credibility . . . we
6 will remember this mistake for a long time and hopefully not repeat it."

7     83.   Perry admitted in an August 13, 2007 e-mail that "[o]ur industry went too
8 far in allowing automated underwriting and risk-based pricing to take precedent [sic]
9 **over common sense underwriting.**"  (Emphasis added.)  In other words, extraordinary
10 or unusual measures by the Bank were hardly required in order to avoid losses.

11     84.   In a September 7, 2007 e-mail chain with Bank personnel, Perry commented
12 on a paper David Hickey (a Bank senior vice president involved in secondary marketing)
13 wrote on housing decline.  Perry stated: "we were idiots, absolute idiots to allow
14 ourselves to do 80/20 piggybacks at the tail end of a long run in housing . . . when we
15 knew speculators were lying about occupancy to get these loans."

16     85.   In a September 14, 2007 email chain involving Perry, one Bank senior
17 officer admitted that "if I were to summarize my own top level 'lessons learned' as a
18 result of the 2007 'hurricane' in the mortgage business, I could do so very simply, and
19 probably cover 75% of the losses we will ultimately suffer – 'in bad markets, seconds and
20 condo's [sic] are crap!!!!!'"

21     86.   In an October 15, 2007 e-mail transmitted to Bank personnel, Perry
22 acknowledged that the Bank put too much emphasis on production rather than credit
23 quality.  Given the bad news circulating in the mortgage industry, Perry noted that "[t]he
24 world has changed . . . **we need to be concerned about credit quality and profitability**
25 **. . . not loan volume and market share.**"  (Emphasis added.)

26     87.   In an October 26, 2007 e-mail chain involving Perry, one Bank senior
27 officer agreed with Bank senior manager John Olinski's assertions that (a) the Bank
28 would have avoided credit losses if it had cut guidelines more quickly, (b) the Bank

402236
34
COMPLAINT FOR NEGLIGENCE

"wouldn't have sustained anywhere near the losses, if we had a sound credit culture and reasonable underwriting controls" and (c) the bank had a production driven culture with no credit accountability in production related [compensation] plans.  This senior officer further acknowledged that it was not just piggyback loans that caused the Bank's losses; further, the Bank was responsible for "lousy underwriting."

88.   An October 30, 2007 Bank board handout by Perry listed, among other things, what the Bank did wrong:

"What We Got Wrong

Following our major competitors, **we went too far in expanding our product guidelines** during the housing boom

Seconds/HELOCS

Piggybacks

Subprime

Our underwriting procedures, like all in the industry, failed to detect speculators entering high CLTV [combined loan to value ratio] purchase transactions.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

We underestimated the length and severity of the housing downturn."

(Emphasis added.)

89.    Perry reiterated these mistakes in his November 6, 2007, Bancorp Third Quarter Review, and added "in hindsight we could have expanded more cautiously from 2005 to 2007." He acknowledged that: "Until the 2007 Secondary Market disruption IndyMac was able to sell into the secondary market its Alt-A and option ARM credit risk exposure . . . **Even so, we took too much exposure from seconds, HELOC and subprime.**" (Emphasis added.)

90.    In a January 8, 2008 e-mail to Bank managers, shortly after the transfer of the $10 billion loan pool from Held For Sale to Held for Investment at a then-projected lifetime loss to the Bank of $600 million, Perry admitted his role in creating the Bank's problems: "Clearly, our risk officers are not to blame for the situation IMB finds itself in . . . . **This time the losses are 100% operating management's fault (from me on down)** . . . there is no substitute for experience, good common sense and business judgment, **and timeless credit underwriting principles (like our new standards we have).**" (Emphasis added.)

91.    In the earnings conference call for Bancorp the fourth quarter of 2007 on February 12, 2008, Perry admitted that Bank management failed to focus on macro issues and to curtail volume and risk accordingly: "we were **too micro focused** and **I think you will see us be more conscious of the cycles** and look to curtail business activities and hedge them." (Emphasis added.)

92.    Perry sent a March 19, 2008 e-mail to senior managers and the IndyMac board listing again "what we did wrong," including his blind adherence to risky industry practices that he should have rejected early:

"1.    We should have 'bucked' the industry (given the home price appreciation stats) **starting in early 2006** and eliminated all piggybacks [80/20 loans], subprime, no loans over 80% [LTV] without MI [mortgage insurance], and builder construction.  And dramatically cut back limited doc loans, HELOCs and option arms . . . with a strong consumer friendly

mortgage suitability test in place for all loans.

     2.    **We should not have built a portfolio of loans and securities with spreads at historically tight levels.**

     3.  ……………………………………………………

     4.    **We should have had an early delinquency detection system on all new production and fired customers, underwriters, etc. who did not meet a strict quality standard.**

     5.  ……………………………………………………

     6.    **We should never have allowed non-GSE production to exceed ½ of our total production. . . we should have been more of a GSE and FHA/VA lender** [Federal Housing Administration/Veterans Administration] and focused on being THE low cost lender."

(Emphasis added.)

    93.   In the first quarter of 2008, Perry listed in his own handwriting "Big Mistakes" he made.  These echo much of what Perry acknowledged above and included, among other points,

    "1.    Labeling ourselves an Alt-A lender [and] poor labeling of doc types.

2.    Allowing too much of our production to be sold private label [and] not enough to GSE's/FHA VA.

3.    Giving up on documenting income.

4.    Giving up on the GSE and FHA/VA first time home buyers [and] going piggyback.

5.    Stretching too far on piggys and subprime.

6.    Poor oversight in 2ndary, servicing, Treasury [and] accounting of business units.

7.    Secondary selling loans that they knew did not meet our reps and warranties (in particular conduit) [and] not get contracts tight despite repeated requests from CEO.

8.    Conduit justifying not investing in basic infrastructure, controls [and] discipline through strong volumes and profits.

9.    ...................................................

10.   ...................................................

11.   Poor forecasting and poor communication despite huge number of accountants and analysts.  Business unit margins, MBR [mortgage banking revenue], thrift, net interest

402236

38

COMPLAINT FOR NEGLIGENCE

margin.

12.    Little to no overall command and control of credit

risk. . . ."

94.    In a March 31, 2008 news article in <u>Crain's Financial Week</u>, Perry summarized his responsibility for the Banks performance, stating: "look, we've had lousy performance, and the buck stops with the CEO. . . . I'm a big believer in being held to account."

**DEFENDANT'S DUTIES TO INDYMAC**

95.    As an officer of IndyMac, defendant Perry owed duties to IndyMac to carry out his responsibilities by exercising the degree of care, skill, and diligence that ordinarily prudent bankers in like positions in depository institutions would use under similar circumstances.  These duties included, but were not limited to, the following:

(a)    To establish, enforce and follow careful, reasonable, prudent, and non-negligent lending policies;

(b)    To ensure the careful, reasonable, prudent and non-negligent underwriting and administration of IndyMac's loans;

(c)    To ensure that IndyMac did not engage in unsafe, unsound, unreasonable and imprudent practices;

(d)    Upon receiving notice of an unsafe or unsound practice, to make a reasonable investigation thereof and to exercise due and reasonable care with respect to all facts that a reasonable investigation would have disclosed;

(e)    To ensure that loans not be made to non-creditworthy borrowers and/or borrowers in financial difficulty;

(f)    To ensure that loans not be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or guarantor, the prospective source of repayment, and the security provided for the loans;

(g)     To ensure that loans not be made where there was very little likelihood of the borrower repaying the loan within the term of the loan;

(h)     To properly inform himself about the true nature and condition of the Bank's loan portfolio, and to adequately review and inquire into the Bank's loan transactions; and

(i)     To otherwise act with due and reasonable care with respect to the Bank's operations.

## CLAIM FOR RELIEF

### (Against Defendant Perry For Negligence)

96.    Plaintiff incorporates by this reference each and every allegation of paragraphs 1 through 95, inclusive.

97.    Defendant Perry breached his duties to the Bank and acted negligently in allowing the Bank to continue to generate and purchase loans for sale into the secondary market at least after April 1, 2007 when he knew, or reasonably should have known, that the secondary market's interest in purchasing such loans was uncertain and volatile, especially where there was an approximate delay of 90 to 180 days between generation or purchase of the loans and the Bank placing them on the market for sale or resale.

98.    As a direct and proximate result of such negligence, FDIC-R was damaged in an amount to be proven at trial, but in a sum in excess of $600 million, according to proof.

## PRAYER

WHEREFORE, plaintiff Federal Deposit Insurance Corporation, as Receiver for IndyMac Bank, F.S.B., prays for relief against defendant Michael Perry as follows:

1.    For damages in an amount to be proven at trial but in a sum in excess of $600 million, according to proof, plus pre- and post judgment interest as provided by law;

2.    For costs of suit against defendant; and

///
///

402236

COMPLAINT FOR NEGLIGENCE

3.    For such other and further relief as this court deems just and proper.

Dated:  July 6, 2011

NOSSAMAN LLP
STEPHEN P. WIMAN
SCOTT N. YAMAGUCHI

By: _____
        STEPHEN P. WIMAN

Attorneys for Plaintiff Federal Deposit Insurance Corporation, as Receiver for IndyMac Bank, F.S.B.

## JURY DEMAND

Plaintiff Federal Deposit Insurance Corporation, as Receiver for IndyMac Bank, F.S.B., requests a trial by jury for all claims alleged herein.

Dated:  July 6, 2011

NOSSAMAN LLP
STEPHEN P. WIMAN
SCOTT N. YAMAGUCHI

By: _____
        STEPHEN P. WIMAN

Attorneys for Plaintiff Federal Deposit Insurance Corporation, as Receiver for IndyMac Bank, F.S.B.

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Otis D. Wright II and the assigned discovery Magistrate Judge is Michael Wilner.

The case number on all documents filed with the Court should read as follows:

## CV11- 5561 ODW  (MRWx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

========================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [X] **Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | [ ] **Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | [ ] **Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |
|---|---|---|

Failure to file at the proper location will result in your documents being returned to you.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

FEDERAL DEPOSIT INSURANCE CORPORATION,
AS RECEIVER FOR INDYMAC BANK, F.S.B.,

                                    PLAINTIFF(S)

            v.

MICHAEL PERRY,

                                    DEFENDANT(S) .

CASE NUMBER

**CV11-5561** ODW (MRWx)

**SUMMONS**

TO:   DEFENDANT(S): MICHAEL PERRY

A lawsuit has been filed against you.

        Within 21 days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached [x] complaint [ ] _____ amended complaint [ ] counterclaim [ ] cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, NOSSAMAN LLP , whose address is 777 S. FIGUEROA STREET, 34TH FLOOR, LOS ANGELES, CALIFORNIA 90071 . If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated:   JUL 6 2011

By: _____
            Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐ )

FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER FOR INDYMAC BANK, F.S.B.

**DEFENDANTS**

MICHAEL PERRY

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

NOSSAMAN LLP
STEPHEN P. WIMAN (SBN 54825)
SCOTT N. YAMAGUCHI (SBN 157472)
777 S. Figueroa Street, 34th Floor
Los Angeles, CA 90071
213.612.7800

Attorneys (If Known)

---

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☒ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☐ 3 Federal Question (U.S. Government Not a Party)

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

---

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from another district (specify):

☐ 6 Multi-District Litigation

☐ 7 Appeal to District Judge from Magistrate Judge

---

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☒ No ☒ **MONEY DEMANDED IN COMPLAINT: $** Over 600 Million

---

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

Negligence of banking officer defendant

---

**VII. NATURE OF SUIT** (Place an X in one box only.)

**OTHER STATUTES**
☐ 400 State Reapportionment
☐ 410 Antitrust
☒ 430 Banks and Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Sat TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 890 Other Statutory Actions
☐ 891 Agricultural Act
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 895 Freedom of Info. Act
☐ 900 Appeal of Fee Determination Under Equal Access to Justice
☐ 950 Constitutionality of State Statutes

**CONTRACT**
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

**REAL PROPERTY**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**TORTS**
**PERSONAL INJURY**
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Fed. Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Personal Injury-Med Malpractice
☐ 365 Personal Injury-Product Liability
☐ 368 Asbestos Personal Injury Product Liability

**IMMIGRATION**
☐ 462 Naturalization Application
☐ 463 Habeas Corpus-Alien Detainee
☐ 465 Other Immigration Actions

**TORTS**
**PERSONAL PROPERTY**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**BANKRUPTCY**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**CIVIL RIGHTS**
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/Accommodations
☐ 444 Welfare
☐ 445 American with Disabilities - Employment
☐ 446 American with Disabilities - Other
☐ 440 Other Civil Rights

**PRISONER PETITIONS**
☐ 510 Motions to Vacate Sentence Habeas Corpus
☐ 530 General
☐ 535 Death Penalty
☐ 540 Mandamus/Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**FORFEITURE/PENALTY**
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 R.R. & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**LABOR**
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 730 Labor/Mgmt. Reporting & Disclosure Act
☐ 740 Railway Labor Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act

**PROPERTY RIGHTS**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**SOCIAL SECURITY**
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS - Third Party 26 USC 7609

---

**FOR OFFICE USE ONLY:** Case Number: CV11-5561

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

V-71 (05/08)

CIVIL COVER SHEET

Page 1 of 2

CCD-JS44

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**VIII(a).  IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?  [X] No  [ ] Yes
If yes, list case number(s): _____

**VIII(b).  RELATED CASES:** Have any cases been previously filed in this court that are related to the present case?  [X] No  [ ] Yes
If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply)  [ ] A. Arise from the same or closely related transactions, happenings, or events; or
[ ] B. Call for determination of the same or substantially related or similar questions of law and fact; or
[ ] C. For other reasons would entail substantial duplication of labor if heard by different judges; or
[ ] D. Involve the same patent, trademark or copyright, **and** one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
[X]  Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
|  |  |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
[ ]  Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles |  |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
Note: **In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| LOS ANGELES |  |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved

**X. SIGNATURE OF ATTORNEY (OR PRO PER):** _[signature]_    Date July 6, 2011
STEPHEN P. WIMAN

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |